FILED

07/21/2026

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 24-0023

DA 24-0023

IN THE SUPREME COURT OF THE STATE OF MONTANA

2026 MT 158

STATE OF MONTANA,

       Plaintiff and Appellee,

  v.

PHILLIP MICHAEL FRISCIA,

       Defendant and Appellant.


APPEAL FROM:   District Court of the Eighth Judicial District,
In and For the County of Cascade, Cause No. BDC-22-804
Honorable Elizabeth A. Best, Presiding Judge


COUNSEL OF RECORD:

      For Appellant:

        Pete Wood, Attorney at Law, Boise, Idaho

      For Appellee:

        Austin Knudsen, Montana Attorney General, Roy Brown, Assistant
Attorney General, Helena, Montana

        Joshua A. Racki, Cascade County Attorney, Amanda L. Lofink,
Deputy County Attorney, Great Falls, Montana


             Submitted on Briefs:  March 25, 2026

                 Decided:  July 21, 2026

Filed:

                           _____
                                 Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1 Phillip Michael Friscia (Friscia) appeals from his conviction by *Alford*[1] plea of the charge of threatening an officer, a felony, in violation of § 45-7-102(1)(a)(i), MCA. He challenges the order entered by the Eighth Judicial District Court, Cascade County, denying his motion to suppress (Order), which he reserved the right to appeal in the plea agreement. We restate the issues raised by Friscia as follows:

1. *Did the District Court err by denying the motion to suppress and dismiss?*

2. *Did the District Court err by denying the facial constitutional challenge to § 45-7-102(1)(a)(i), MCA?*

We affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

¶2 On November 18, 2022, a call was made in Great Falls to 9-1-1, wherein, according to the District Court's post-hearing findings, "a clearly frantic and distraught female is heard crying, pleading for help because her former partner had locked her out of the house and has 'our' baby." The caller would later be identified as Shanelle Parker (Parker). The operator asked Parker where she was calling from, and Parker reported her location as 1626 6th Avenue North, in Great Falls. The operator asked for her name, but Parker did not immediately respond, and instead indiscernible shouting could be heard in the background of the call, with Parker yelling "Don't! Don't! Don't!" and "Don't do this!" A male voice is heard and Parker continued to scream until the call disconnected, without

---

[1] *North Carolina v. Alford*, 400 U.S. 25, 91 S. Ct. 160 (1970).

Parker giving any additional information. The male was later identified as Friscia. Parker and Friscia lived together in a multifamily apartment dwelling.[2]

¶3 Law enforcement dispatch coded the call as a priority disturbance requiring immediate police response, and provided a "use caution" advisory. Lead Officer Zaine O'Meara believed it was a serious call with "a female who was potentially being assaulted." When he and other officers from the Great Falls Police Department arrived at 1626 6th Avenue North, they did not know which unit in the building was involved with the disturbance, given the limited information provided by Parker in the call. To gain more information, O'Meara knocked on the door of a unit in the building. The male inhabitant answered the door holding a firearm, stating there had been an "ongoing disturbance" in another unit and that he was fearful about answering the door. O'Meara asked dispatch to try to re-contact the caller, but the attempt was unsuccessful.[3]

¶4 After O'Meara spoke with this neighbor, he saw a man leaving a different unit, who, after noticing the police, turned and attempted to re-enter his unit. O'Meara made verbal contact with the man and asked to speak with him. The man, who was later identified as Friscia's brother, Marc, lived on the first floor of the apartment building. Marc informed Officer O'Meara that he had heard the sounds of a disturbance from Friscia and Parker's

---

[2] This case was not tried. The District Court conducted an evidentiary hearing on Friscia's motion to suppress, at which time testimony was taken and exhibits admitted, including the 9-1-1 call and photographs of the scene.

[3] Officers would find Parker's broken phone after ultimately entering Friscia's unit.

unit. Marc did not then advise, as police would later learn, that Marc's 15-year-old son was babysitting in Friscia's unit.

¶5 O'Meara, Officer Patina, and a trainee officer, Officer Whitsitt, then heard a male and a female indiscernibly screaming within Friscia's unit. O'Meara testified of a concern the female was being assaulted therein, which he explained was based upon the 9-1-1 call, the location of the continuing screaming, and his six years of experience as a police officer. O'Meara was advised by dispatch that the caller's phone had not been answered.

¶6 O'Meara and Whitsitt entered an exterior door on the first floor of the building, which led into to a stairwell and a set of stairs going up to a landing. O'Meara testified that he thought the exterior door and the stairwell were "like a common area that would open up to other apartments." From the landing, the steps took an L-turn and continued up, out of sight from the exterior door, to the front door of a single unit, wherein Friscia resided. O'Meara explained that, looking up from the landing, there was about an inch of open space under the unit door through which he could see into the unit. Through this space O'Meara saw a set of feet, which he testified made it "very obvious that somebody was standing just on the other side of the door."

¶7 O'Meara called out several times identifying himself as law enforcement and asked the person to open the door and step outside to talk to them, as he needed to figure out what was going on. The person, Friscia, loudly and angrily refused, told police to leave, and began repeatedly opening the door and slamming it closed again, which, as O'Meara testified, "was making it very difficult for me to communicate with him, because I would only have moments, seconds, to see him physically . . . . And on one or two of the times

4

that he opened the door the kid would be in his arms. And then the other two times he wouldn't have the kid with him." O'Meara testified that "my mind [was] trying to process this information and determine what his intent is," including whether there was a woman harmed inside, whether Friscia intended to harm the child, and whether he would grab a weapon during one of the times he closed the door. Then, as captured on the officers' Watchguard audio, Friscia loudly stated, "please get out of my house," and then shouted, "I have the right to fucking defend myself from people that are in my house!"

¶8 O'Meara testified he immediately became concerned because, "that to me means they're threatening to cause harm to me if I don't omit [sic] from my investigation and just simply leave. And that's exactly what I – how I perceive it, was that he plans to quote/unquote 'defend' his property if I don't leave." Concerned that the officers had bunched themselves in a "fatal funnel" on the stairway that left "no way for us to defend ourselves" if Friscia charged them, O'Meara told the officers, "we need to get out of this staircase right now," and they exited the building.

¶9 Back outside of the building, O'Meara noticed the curtains moving in Friscia's unit on the second floor, which O'Meara testified "was obvious that he was looking out on the street to us to find out where we were." Concerned about Friscia having a weapon and Friscia's statement about defending his residence, O'Meara feared Friscia "was going to take up some form of a defensive position from these windows and start shooting at us from that second story apartment," or that this could become a hostage situation. Friscia then came down the stairs to the exterior door and began speaking with his brother, Marc. O'Meara, saying he "fell back on [his] training," began to approach the door and said to

5

Friscia, "Okay. Look, you're outside. Let's have a conversation." However, upon seeing O'Meara approach, Friscia slammed and locked the exterior door. The District Court found that, "[b]ecause of the heightening concern for safety of the baby and others, the officers breached the door as Friscia ran up the stairs." Concerned that the chance to protect the parties inside would evaporate, O'Meara drew his taser and fired one cartridge into Friscia just before Friscia would have turned at the landing and disappeared from view. The officers took him into custody, found Parker holding the baby, and determined that no one was injured.

¶10 The State charged Friscia with one count of making a threat to an officer, a felony, pursuant to § 45-7-102(1)(a)(i), MCA, and with criminal destruction of a communication device, a misdemeanor, pursuant to § 45-6-105, MCA. Friscia moved the District Court to "suppress any statements or evidence obtained as a result of the illegal entry into Defendant's home on November 18, 2022," contending police had entered his residence, including the stairwell, without probable cause and "without consent or any exception to the search warrant requirement," including exigent circumstances. Further, Friscia argued that § 45-7-102(1)(a)(i), MCA, was facially unconstitutional because the "statute's failure to separate unlawful threats, which it may prohibit, from lawful threats, which it often may not [prohibit], may render the statute unconstitutionally overbroad."[4]

¶11 The District Court reasoned that, from the frantic nature of the 9-1-1 call, which abruptly ended and was unable to be reconnected, and from officers' observations of

---

[4] Friscia's district court briefing confirmed that "Mr. Friscia is not challenging the constitutionality of § 45-7-102(1)(a)(i) as applied to him."

6

Friscia's behaviors, police "reasonably believed a citizen may be in imminent danger" within the unit, specifically, "that a woman was actively being assaulted." The court found that the exterior door had no doorbell, as Friscia had claimed in his testimony, that the stairwell area outside of the living area had the appearance of being publicly accessible, and that the photographs "support the officers' reasonable belief that the stairwell was a common area." The court found that "Friscia made statements which, under the circumstances, supported a reasonable belief that he had a weapon and intended to use it." The court further found that officers heard voices of other persons in the apartment, including a female, and that it appeared the conflict was escalating, rather than calming. Considering these facts, the District Court concluded that police entry into Friscia's unit was justified by exigent circumstances, and denied the motion to suppress. Then, regarding the constitutional challenge to § 45-7-102(1)(a)(i), MCA, the District Court reasoned that the statute serves a plainly legitimate purpose and, while Friscia had raised a concern that the statute's use of the term "harm" could be applied to innocent expressions of speech, the statute was not facially unconstitutional under this Court's decisions in *State v. Dugan,* 2013 MT 38, 369 Mont. 39, 303 P.3d 755, and *State v. Spottedbear*, 2016 MT 243, 385 Mont. 68, 380 P. 3d 810.

¶12 Thereafter, Friscia entered a plea agreement with the State wherein he agreed to plead guilty via *Alford* to both pending charges, and reserved the right to appeal the denial of his motion to suppress and dismiss. The District Court accepted Friscia's *Alford* plea and entered a judgment pursuant to the plea agreement, sentencing Friscia to a three-year commitment to the Montana Department of Corrections, all suspended.

7

¶13 Friscia appeals.

## STANDARD OF REVIEW

¶14 "We review the denial of a motion to suppress to determine whether the trial court's findings of fact are clearly erroneous and whether it correctly applied those findings as a matter of law." *City of Missoula v. Iosefo*, 2014 MT 209, ¶ 8, 376 Mont. 161, 330 P.3d 1180 (citation omitted). "A trial court's findings are clearly erroneous if not supported by substantial evidence, if the court has misapprehended the effect of the evidence, or if this Court's review of the record leaves us with the firm conviction that a mistake has been made." *State v. Roberts*, 1999 MT 59, ¶ 11, 293 Mont. 476, 977 P.2d 974 (citation omitted).

¶15 The Court utilizes plenary review of constitutional issues on appeal. *Clark v. State*, 2025 MT 87, ¶ 5, 421 Mont. 429, 567 P.3d 941 (citation omitted).

## DISCUSSION

¶16 *1. Did the District Court err by denying the motion to suppress and dismiss?*

¶17 "The Fourth Amendment to the United States Constitution and Article II, Section 11 of the Montana Constitution both protect individuals against unreasonable governmental searches and seizures." *State v. Vegas*, 2020 MT 121, ¶ 10, 400 Mont. 75, 463 P.3d 455 (citation omitted). "Law enforcement's entry into a private home without a warrant issued on probable cause constitutes a search for Fourth Amendment purposes[]" and "is considered per se unreasonable unless an exception applies." *Vegas*, ¶ 10 (citation omitted). We have explained that probable cause exists when:

> [T]he facts and circumstances within an officer's personal knowledge, or related to the officer by a reliable source, are sufficient to warrant a reasonable person to believe that another person is committing or has

8

committed an offense. The probable cause determination must be based on an assessment of all relevant circumstances, evaluated in light of the knowledge of a trained law enforcement officer.

*City of Helena v. O'Connell*, 2019 MT 69, ¶ 16, 395 Mont. 179, 438 P.3d 318 (citation omitted).

¶18 "One exception to the warrant requirement is the existence of exigent circumstances coupled with probable cause." *Vegas*, ¶ 11 (citing *State v. Ruggirello*, 2008 MT 8, ¶ 17, 341 Mont. 88, 176 P.3d 252). "Exigent circumstances exist when 'the situation at hand would cause a reasonable person to believe that prompt action is necessary to prevent physical harm to an officer or other person, the destruction of relevant evidence, the escape of a suspect, or some other consequence improperly frustrating law enforcement efforts.'" *Vegas*, ¶ 11 (citing *Ruggirello*, ¶ 17). "We look to the totality of the circumstances when evaluating whether exigent circumstances exist." *Vegas*, ¶ 11 (citation omitted). "'The State bears the heavy burden of showing the existence of exigent circumstances and can meet that burden only by demonstrating specific and articulable facts.'" *Vegas*, ¶ 12 (citing *Ruggirello*, ¶ 18).

¶19 Friscia argues the District Court erred by denying his motion to suppress because the officers' presence in the stairwell, which he contends is the curtilage of his home, became unlawful after he told them to leave, as "the officers lacked probable cause that Friscia was physically assaulting Ms. Parker and that she was in imminent physical danger at that time." Citing *State v. Smith*, 2021 MT 324, ¶ 21, 407 Mont. 18, 501 P.3d 398 ("[s]ociety would recognize Smith's actual expectation of privacy as reasonable when he refused to answer a law enforcement officer's questions outside his own home absent a

warrant"), Friscia argues "the moment Friscia told [the officers] to leave they were legally required to do so" because they did not have a warrant. Friscia also argues the State failed to meet its "heavy burden" of showing the existence of exigent circumstances.

¶20 The District Court's assessment of the totality of the circumstances for purposes of exigency found the officers had knowledge of the following: the substance of Parker's 9-1-1 call as from "a clearly frantic and distraught female" who was crying and pleading for help because she was locked out of the residence and her former partner had her baby, followed by her screaming; the 9-1-1 call had dropped abruptly, and dispatch was unable to reconnect a call to the source phone; a neighbor's information that a disturbance had occurred causing that neighbor to procure a firearm before opening the door; the statement of Marc to them about his hearing a disturbance in Friscia's apartment; their personal hearing of a screaming disturbance, including a woman's voice, coming from Friscia's apartment; observing Friscia's angry and erratic behavior in response to their identification of themselves as police and asking to talk to him, including Friscia's repeated opening and closing of the door, sometimes holding a baby; and, Friscia's statement that he had the right to defend himself from people who were in his house.

¶21 Friscia's challenge to the factual findings is based primarily on legal grounds, arguing that the facts relied upon by the District Court were immaterial or irrelevant to the issues of probable cause or exigency. He contends, for example, the fact that Friscia had a baby was "unknown" to police at the moment Friscia told them to leave, and thus immaterial, because they "had no idea there was a child in the apartment until after Friscia opened the door, which of course was after Friscia had told the officers to leave."

10

Similarly, Friscia argues that his angry demeanor and threatening language to officers occurred only after Friscia told them to leave and opened the door, and thus those facts are immaterial. Friscia premises his dividing line of relevancy on the holding of *Smith* that it was reasonable, under the circumstances of that case, for the resident to refuse to cooperate with officers and ask them to leave until they had obtained a warrant. *Smith*, ¶ 21.

¶22 However, Friscia's focus on each fact in isolation, offering a basis to exclude them individually, fails to consider them in the context of "the totality of the circumstances." *Vegas*, ¶ 11. While officers may not have affirmatively known until after Friscia told them to leave and opened the apartment door that he had the child, they were entitled to consider that possibility, for purposes of probable cause and exigency, from the earlier 9-1-1 phone call in which the female caller reported this fact to police, and were not foreclosed from doing so by *Smith*. In *Smith*, police were investigating a non-violent misdemeanor that occurred off-premises, and had not received, as here, a 9-1-1 call about a potential violent crime and then obtained further confirming information upon their arrival, including personally hearing an ongoing disturbance inside the house. Therefore, *Smith* does not exclude consideration of the facts relied upon by the District Court.

¶23 From these facts, including the recorded 9-1-1 call and photographs of the scene, the District Court concluded that the officers reasonably believed "that a citizen may be in imminent danger," "that the stairwell was a common area," and that Friscia "had a weapon and intended to use it." We conclude the facts relied upon by the District Court were supported by the evidence and not clearly erroneous, and the court was not prohibited from their consideration. The District Court correctly applied the law and we affirm its

11

determination of probable cause and exigent circumstances for the entry into the building, both initially and a second time to secure Friscia's arrest.

¶24     *2. Did the District Court err by denying the facial constitutional challenge to § 45-7-102(1)(a)(i), MCA?*

¶25     Friscia appeals the District Court's denial of his overbreadth facial constitutional challenge to § 45-7-102(1)(a)(i), MCA, and also argues the statute is unconstitutional under the U.S. Supreme Court's decision in *Counterman v. Colorado*, 600 U.S. 66, 143 S. Ct. 2106 (2023), which he contends should be retroactively applied to his case despite not raising the claim in the District Court.  *See Griffith v. Kentucky*, 479 U.S. 314, 328, 107 S. Ct. 708, 716 (1987) ("a new rule for the conduct of criminal prosecutions is to be applied retroactively to all cases . . . pending on direct review or not yet final[]").  The State responds that *Counterman* was decided on June 27, 2023, but that Friscia nonetheless proceeded to enter a guilty plea in September 2023, and thus the claim was waived because retroactivity alone does not make a claim cognizable on appeal, citing *United States v. Booker*, 543 U.S. 220, 268, 125 S. Ct. 738, 769 (2005) (retroactivity of new criminal rule subject to "ordinary prudential doctrines," including "whether the issue was raised below").  Acknowledging this Court's ability to review the issue under the plain error doctrine, the State further contends that *Counterman* does not apply because the flaw within the subject Colorado statute is not present in § 45-7-102(1)(a)(i), MCA, and thus a basis for plain error review is not established.  The State also argues the District Court correctly denied Friscia's overbreadth challenge to the statute.

¶26 In *Counterman*, the defendant's intrusive and caustic messages to a local singer led to charges and conviction under a Colorado statute that criminalized communication with another person that would cause "a reasonable person" serious emotional distress. *Counterman*, 600 U.S. at 70, 143 S. Ct. at 2112 (citing Colo. Rev. Stat. § 18-3-602(1)(c) (2022)). The Colorado district court applied the "reasonable person" standard to the elements of the case and denied Counterman's First Amendment challenge to the statute. *Counterman*, 600 U.S. at 71, 143 S. Ct. at 2112. The Colorado Court of Appeals upheld the district court's ruling, reasoning a defendant's subjective intent did not matter under the statute. *Counterman*, 600 U.S. at 71, 143 S. Ct. at 2113. The U.S. Supreme Court reversed, holding the First Amendment requires the State to "prove in true-threats cases that the defendant had some understanding of his statements' threatening character." *Counterman*, 600 U.S. at 73, 143 S. Ct. at 2113.

¶27 Friscia thus contends that § 45-7-102(1)(a)(i), MCA, is unconstitutional under *Counterman* because he did not subjectively believe his words to officers constituted true threats. The State responds that, unlike the Colorado statute at issue in *Counterman*, Montana's statute does not permit conviction based on a reasonable person objective standard, but instead requires the State to prove the defendant had a subjective "purposely" or "knowingly" mental state. Section 45-7-102(1)(a)(i), MCA ("A person commits an offense under this section if the person purposely or knowingly . . . threatens harm to any person . . . with the purpose to influence the person's . . . exercise of discretion[.]").

¶28 Friscia's argument, premised upon the statute's application in his case, is essentially an as-applied constitutional challenge to the statute. *See City of Missoula v. Mountain*

13

*Water Co.*, 2018 MT 139, ¶ 25, 391 Mont. 422, 419 P.3d 685 ("An as-applied challenge alleges that a particular application of a statute is unconstitutional and depends on the facts of a particular case."). As-applied challenges are generally waived unless first raised in the district court. *See State v. Strong*, 2009 MT 65, ¶ 15, 349 Mont. 417, 203 P.3d 848. Further, the State was not put to the test in this case of proving beyond a reasonable doubt that Friscia subjectively believed he was making a threat to the officers, in accordance with § 45-7-102(1)(a)(i), MCA, because he entered a guilty plea via *Alford*, wherein he conceded that the State could prove the case against him, based upon an offer of proof. Under these circumstances, we conclude that Friscia has not established that a *Counterman* error occurred in this case, or that plain error review is necessary to prevent a manifest miscarriage of justice.

¶29 Friscia argues § 45-7-102(1)(a)(i), MCA, is facially unconstitutional because it sweeps overbroadly to also prohibit constitutionally protected speech. Listing scenarios in which the statute could be applied to the legal exercise of free speech, he argues that "the quantity of pure speech criminalized under 45-7-102(1)(a)(i) is almost limitless given the exceptionally broad definitions of 'harm' and 'property' under 45-2-101(27) & (61)." The State answers that Friscia has failed to demonstrate that any overbreadth of the statute presents a real and substantial effect upon the right of others when compared to its plainly legitimate sweep, which the Court previously recognized in resolving the same issue in *Spottedbear*, and which the State contends that Friscia has largely ignored.

¶30 Facial overbreadth challenges present considerations that contrast the usual analysis of facial unconstitutionality, which requires a determination that a statute be

14

unconstitutional in all applications. *See Montanans Against Irresponsible Densification, LLC v. State*, 2026 MT 53, ¶ 44, 427 Mont. 100, 585 P.3d 977 ("In a facial challenge to these statutes, our review is confined to determining whether the laws fail in all their applications or lack any plainly legitimate sweep."). Instead, a facial overbreadth challenge recognizes that a statute can have a "plainly legitimate sweep" yet go too far, impinging upon protected activities. *See Spottedbear*, ¶ 15 ("Under the [overbreadth] doctrine, a statute that 'can be applied to constitutionally protected speech and expression may be found to be invalid in its entirety, even if it could validly apply to the situation before the court.'") (citing *State v. Lilburn*, 265 Mont. 258, 264, 875 P.2d 1036, 1040 (1994)). "The test for overbreadth therefore 'is not whether hypothetical remote situations exist, but whether there is a significant possibility that the law will be unconstitutionally applied.'" *Spottedbear*, ¶ 16 (citing *Lilburn*, 265 Mont. at 269, 875 P.2d at 1043). "'In short, there must be a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court for it to be facially challenged on overbreadth grounds.'" *Spottedbear*, ¶ 16 (citing *Lilburn*, 265 Mont. at 269, 875 P.2d at 1041 (quoting *Members of the City Council v. Taxpayers for Vincent*, 466 U.S. 789, 800-01, 104 S. Ct. 2118, 2126 (1984))). "When there is no realistic danger or significant possibility that First Amendment protections will be meaningfully compromised, we have held consistently that any unconstitutional application of a statute should be addressed on a 'case-by-case' basis." *Spottedbear*, ¶ 16 (citing *Mont. Supreme Court Comm'n on the Unauthorized Practice of Law v. O'Neil*, 2006 MT 284, ¶ 78, 334 Mont. 311, 147 P.3d 200; and *Lilburn*, 265 Mont. at 270, 875 P.2d at 1044).

¶31 The parties dispute the effect of *Spottedbear*'s analysis. Friscia argues the case considered the overbreadth issue only for purposes of assessing the effective assistance of trial counsel, and therefore is not dispositive. After making this point, Friscia thereafter ignores the analysis provided in that case. The State responds that the Court stated the issue in *Spottedbear* as "[w]hether the improper influence statute is unconstitutionally overbroad," that the scope of the Court's analysis covered the issue, and that Friscia has not identified any reason why this Court's reasoning there was incorrect. *See Spottedbear*, ¶ 11. The State further notes that *Spottedbear* was relied upon by the Supreme Court of Idaho in resolving an overbreadth challenge to a similar statute. *See State v. Sanchez*, 448 P.3d 991 (Idaho 2019).

¶32 We, too, are troubled by the absence of any analysis or critique of the Court's analysis of the issue in *Spottedbear*. While that case involved an ineffective assistance of counsel claim, the overbreadth issue was nonetheless extensively addressed to determine whether trial counsel was deficient in failing to raise the issue, ultimately concluding that given "our overbreadth precedent discussed above, Spottedbear's trial counsel reasonably may have concluded that an overbreadth challenge to the statute would not have been successful[,]" and "[i]ndeed, when compared 'to the statute's plainly legitimate sweep,' Spottedbear would have a high hurdle to clear in showing how the statute adversely affects the rights of others in a 'real' and 'substantial' way." *Spottedbear*, ¶ 18 (quoting *Lilburn*, 265 Mont. at 265, 875 P.2d at 1040). That holding was relied upon by the District Court, and this basis for its decision cannot be ignored. We thus reach a like conclusion to that in *Zolnikov v. Nat'l Bd. of Med. Examiners*, 2023 MT 51, ¶ 25, 411 Mont. 339, 526 P.3d 1088,

that Friscia "has provided no persuasive argument that we were 'manifestly wrong' and should overturn our precedent[.]" We therefore affirm the District Court's denial of the facial overbreadth challenge to § 45-7-102(1)(a)(i), MCA.

¶33    Affirmed.


                                           /S/ JIM RICE


We Concur:

/S/ CORY J. SWANSON
/S/ LAURIE McKINNON
/S/ BETH BAKER
/S/ INGRID GUSTAFSON